## NOKOMIS CREAMERY COMPANY
### v.
### PHILLIP H. GRENNAN.

*Master and Servant—Recovery of Wages—Negligence or Bad Faith on Part of Plaintiff—Weight of Evidence—Instructions.*

In an action brought against a creamery company by a person who had been in its employ as a superintendent, where the defense was that plaintiff had been guilty of negligence or bad faith in the conduct of defendant's business, this court holds that the evidence justified a verdict for the plaintiff and that the record was free from serious error.

[Opinion filed May 20, 1892.]

APPEAL from the Circuit Court of Montgomery County; the Hon. JACOB FOUKE, Judge, presiding.

Mr. JAMES M. TRUITT, for appellant.

Messrs. T. M. JETT and LANE & COOPER, for appellee.

MR. JUSTICE PLEASANTS. Appellee was employed as superintendent of appellant's creamery from July, 1887, until January 6, 1890, when it was closed, at a monthly salary of $55, and three cents per pound for gathering cream. He was paid only up to December 1, 1889, and brought this action before a justice of the peace for the balance claimed, amounting to $155.70. It was not denied that this was just what was due by the terms of his employment, but it was claimed that through his fault the company was damaged to an amount exceeding that sum. He had charge of the factory and conducted its operation, kept account of the cream received, made and weighed and shipped out the product, and reported at the end of each month to its secretary, under whose orders he acted. It did not charge, nor attempt to prove, nor claim to know of any

Nokomis Creamery Co. v. Grennan.

particular act of fraud, negligence or unskillfulness on his part, nor in what, even in a general way, any such fault consisted. The complaint was based upon the general result of his operation from the first of November, 1889, as claimed to be shown by his own reports, which was that the butter accounted for was about two thousand pounds, being about twenty per cent less than should have been made from the quantity of cream received.

It appears that the business was commenced upon the gauge system, so called (which is not clearly explained by the testimony), but this proving unsatisfactory, in November, 1887, they put in a test churn to show more accurately the proportion of butter to cream from a sample vial taken by the drivers, and brought in with each lot as collected. These were to be paid for by the "gauge," which is understood to be a quantity representing a pound of butter, and therefore varying according to its quality. The shortage appeared by the reports to be in nearly the same proportion for November, December and the fraction of January. Whether this was due to the fault of appellee—any lack of ordinary skill or care, or of honesty—was really the only issue before the jury, and upon that the burden of proof was upon appellant.

The evidence on its part consisted of these reports for the months mentioned, and the oral testimony of its secretary, which was to the effect that appellee advised the putting in of the test churn; that up to November his reports generally showed a substantial agreement between its indications and the quantity of butter actually made ; that by frequent comparisons in November and December he found the test practically accurate at those times also, and yet that he failed to account for the apparent shortage. He admitted that the report for June, 1889, showed an excess of butter made over the quantity called for by the test churn, amounting to 427 pounds, and stated that he then told appellee he wanted no more of such reports, that the directors would not stand it, that if it got out it would hurt the business of the company with the farmers, and that he must run his

test and churn so as to make them come out about even. Upon this record of his operations it was conceded that appellee was skillful enough, but claimed that for these last months he must have been either negligent or dishonest.

Since the charge was general, and sought to be established as an inference from the fact of shortage, without proof pointing to any specific act as wrongful, he could do no more to meet it than to make a general denial and show that the fact relied on might have been the effect of some other cause. He did so deny it, and suggested divers ways in which the apparent shortage might be accounted for without fault on his part, chiefly by the condition of the machinery used and the possible unfairness of the samples brought in. He did not claim to know how it did occur in this case, but asserted that it might be accounted for to as great an amount by the unreliability of the test churn alone. The testimony as to the course and method of the work was meager, and to our minds not entirely clear. All that we learn of it is, that the cream when brought in was measured in the pail and the number of inches taken; that the sample bottles, on a little frame made to hold them, were put into the test churn, by the working of which "the butter was melted" (as the witness puts it), and after cooling, measured, and by the percentage thus ascertained the number of inches in the lot was multiplied, a statement which seems to us incomplete, but may have been full enough for a judge and jury from a butter making community. Appellee says the accuracy of the result obtained might "depend upon the driver. He would have to fill the bottle just so full. If he got ten inches of cream and got a poor sample, we would get more than we paid for, and if a good sample it would be the other way." Of the test churn he says it might be all right one day, and the next "away off." So far there was no contradiction. And he attempted to go farther. His witness, who had worked in the creamery, and in our opinion shown himself qualified to answer, was asked to "explain to the jury how there might be an excess or shortage by the use of this tester;" but appellant

objected and was therein sustained, to the prejudice of its case, as we may well suspect, but of which it can not complain. He introduced all of his reports except those already in from December, 1887, to October, 1889, covering all the time that the test churn was used, from which it appeared that discrepancies both ways were common, though generally small; but in April and June, 1889, each, there was an excess of more than 400 pounds, though in March it was only five and in May less than three. If he was honest, these reports tended to show both skill and care, and his reporting and turning over to the company these considerable and unexpected excesses had some tendency to prove that he was honest. To what, then, could the discrepancies be attributed except the causes he had suggested? And if they could operate so far in one direction in April and June, why not as far or farther in the other in November and December?

Counsel complain of the admission of these reports on the ground that they might have misled the jury to set off excesses against shortages. That danger, if any such there was, was fully guarded by an instruction given; but there was none that could hurt appellant, since they showed, notwithstanding the excesses of April and June, a shortage on the whole operation up to November, 1889, of 168 pounds, leaving those of that month and the time following, subject to no such offset. Having been made to and received by appellant, and being pertinent to the issue, as above indicated, we think they were rightly admitted.

Appellee also testified to other excesses after June, which he says were only reported to the secretary privately, and pursuant to his direction given when the regular report for June was submitted; that for July it was about 200 pounds, and another was of 680. These results would further show the unreliability of the *data* on which appellee seeks to charge him. The secretary denied the alleged direction, reiterating his own version of it as hereinbefore given, and denied that he received any information of excesses but of the regular reports. He admitted, however, that he

thought there was an excess in July, for which month the regular report shows a shortage of twenty-seven pounds.

From the foregoing, it seems clear that whether the shortage complained of was caused by any fault of appellee was the issue in the case, and that upon the evidence submitted, it was open to honest debate. We find it hard to determine on which side is the preponderance. But the justice of the peace and two juries in the Circuit Court have found for the appellee, and each for the same amount, being the exact sum claimed. In such a case this concurrence ought to be conclusive, unless there was material error in the ruling of the court. On the last trial nine instructions were given for the defendants, as asked, and none refused. Only three were given for the plaintiff. But of these it is said that each was erroneous. The first two contained the proposition, in substance, that the plaintiff was not chargeable for any shortage complained of, unless it was caused by his unskillfulness or negligence; and the objection to them is that they omit bad faith, in consequence of which omission it is supposed the jury might have understood that while he should be charged with whatever butter he could have made from the cream received, by the exercise of ordinary skill and care, and failed to make through a failure to exercise them, he would not be so for any that he did make but fraudulently withheld from the company. We think better of the intelligence of the jury. The fraud here referred to must have been actual fraud. That necessarily involves the element of wilfulness, and is thereby distinguished from mere negligence. But in a general sense, negligence is an omission of duty, whether fraudulent or not. These instructions did not limit the plaintiff's liability to the results of his mere negligence, and if he fraudulently omitted to report and appropriated to his own use butter in his charge belonging to the defendant, we apprehend that no juror would acquit him of negligence. Moreover, in three of the instructions for the defendant on this subject, bad faith was expressly included. We therefore can not suppose that the jury were misled by the omission in question.

The third instruction defined ordinary skill as "that degree of skill which men engaged in that particular art or business usually employ," and it is said this authorized a comparison of appellee's skill with that of the directors and secretary, who may have had none, though they were "engaged in that particular business." Assuming that the criticism is seriously made, it is a sufficient answer to say that the second instruction for the defendant, given as asked, defines it as "such reasonable skill as is ordinarily exercised by persons of ordinary capacity engaged in the same business;" which expresses the same idea, and is, in our judgment, correct.

We have thus noticed all the grounds of objections urged to the judgment, and finding them untenable, it will be affirmed.

*Judgment affirmed.*